IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Case No.: 1:18-CV-140

| | |
|---|---|
| THOMAS E. PENN, JR., <br> Plaintiff; <br> <br> v. <br> <br> CITY OF WINSTON SALEM <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )      **COMPLAINT** <br>      **(Jury Trial Demanded)** |

Preliminary Statement

1. This action is brought to remedy discrimination against Thomas Penn on the basis of race and for retaliation for raising concerns of racial discrimination. This Complaint is brought under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq*. He also asserts claims of racial discrimination and retaliation pursuant to Article I, § 19 and 35 of the Constitution of North Carolina. Plaintiff seeks declaratory and injunctive relief, back wages and benefits, promotion or front pay, compensatory damages, attorney's fees, costs, and interest as may be allowed by law.

Jurisdiction and Venue

2. This Court has jurisdiction over this subject matter and the parties pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

3. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff and Defendant are located in the Middle District of North Carolina, and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the Middle District of North Carolina.

1

## Parties

4. Plaintiff Thomas E. Penn, Jr. is an African-American man who is a resident of Forsyth County, North Carolina. He has been employed by the Winston Salem Fire Department since approximately March 1993.

5. Defendant City of Winston Salem ("City) is located in Forsyth County and oversees the Winston Salem Fire Department at which Plaintiff has been employed for all times relevant to the claims asserted. It is a municipality created and functioning under the laws of North Carolina.

## Facts

6. Thomas E. Penn, Jr. is an African-American man who has been employed by Winston Salem Fire Department ("Fire Department") as a firefighter since approximately March 1993.

7. Mr. Penn's supervisors have consistently rated his work performance as "exceeded expectations" and "top performer" in his performance evaluations.

8. In 2013, Mr. Penn began serving as an Engineer at Station Two, Engine Company 2. Station Two contains Truck Company 2 and Engine Company 2. Truck Company 2 is assigned the rescue specialty of Water Rescue, and firefighters assigned to it are required to obtain specialty certification. Engine Company 2, where Mr. Penn worked, is an assisting unit and firefighters on that engine do not require any specialty certification.

9. On September 28, 2015, Mr. Penn began serving as temporary Acting Captain of Engine Company 2 in Station Two due to the long-term absence of the company's Captain. Pursuant to the City's policy on temporary promotion, after Mr. Penn served more than ten consecutive 24 hour shifts, he began receiving a 5% increase in his base pay ("Acting Pay").

10. Mr. Penn's direct supervisor at Station Two was Battalion Chief Darin Needham ("Battalion

2

Chief Needham"). Battalion Chief Needham is white.

11. In August 2016, Harry J. Brown, Jr., ("District Chief Brown") began serving as District Chief of the Fire Department district which includes Station Two, District Four. District Chief Brown was Battalion Chief Needham's direct supervisor.

12. On or about September 14, 2016, Battalion Chief Needham told Mr. Penn that he was in violation of the Fire Department's facial hair grooming policy.

13. The Fire Department's policy on personal appearance, General Order 1.6, states that mustaches must be neatly trimmed and are not to extend outward or downward past the corner of the mouth. Beards, goatees and other facial hair are not permitted. This policy has been effective since at least 2005 and was last modified in 2012.

14. During the time that the personal appearance policy was effective, many firefighters in the Fire Department wore, and continue to wear, facial hair, including mustaches and goatees, that are in technical violation of the facial hair grooming policy.

15. Mr. Penn has worn a slim-lined goatee since he was first employed with the Fire Department in 1993. Prior to September 2016, Mr. Penn was never informed that his facial hair was against policy.

16. Since approximately September 2016, the facial hair grooming policy has not been applied equally to all employees. Numerous white firefighters with facial hair in violation of the policy have not been disciplined, while African-American fire fighters have been disciplined for wearing similar facial hair styles as their white colleagues.

17. For example, African-American firefighters Daryl Davidson and Justin Hairston were disciplined on November 23, 2016 and December 20, 2016, respectively, for wearing facial hair

described by Fire Chief William Mayo as a "soul patch." White Fire Engineer Lowe, however, wore a similar goatee style in 2016 and was not disciplined.

18. On September 15, 2016, District Chief Brown circulated a memorandum to Fire Department employees stating that General Order 1.6, the personal appearance policy, was not an option and would be strictly enforced.

19. On September 23, 2016, Mr. Penn filed a grievance with the City about the unequal application of the facial hair grooming policy, alleging that Battalion Chief Needham discriminated against him by treating him differently from other firefighters who wore facial hair.

20. Soon after Mr. Penn filed his grievance, he began to be harassed by his supervisors.

21. On September 28, 2016, Captain Zachary Smith told Mr. Penn that he informed Chief Heitman in administration that Mr. Penn was in violation of the facial hair grooming policy. Captain Smith said that he was directed by Chief Heitman to send Mr. Penn home if he did not comply.

22. On October 18, 2016 while Mr. Penn was out responding to a medical dispatch call, Captain Dale Couch retrieved him without warning and took him to a medical facility for a drug screening. Mr. Penn was told this screening was "random."

23. On November 14, 2016, Mr. Penn had a meeting with District Chief Brown and Kemberly Ewing of Human Resources. In that meeting, Mr. Penn raised his concern that Battalion Chief Needham was harassing him because of the complaint he made about the unequal application of the facial hair grooming policy. District Chief Brown told Mr. Penn that he would be transferred from his station because, while other individuals may have been wrong, it was easier to move him than all of them. Mr. Penn responded that he did not want to be transferred.

4

24. On December 27, 2016, Mr. Penn filed EEOC Charge No. 435-2017-00196 stating that officials of the Defendant were applying the facial hair grooming policy unequally and in a racially discriminatory manner.

25. On January 27, 2017, Mr. Penn received notice that he was going to be removed from his position as Acting Captain at Station Two, Engine Company 2 effective February 26, 2017. Mr. Penn had been continuously performing as Acting Captain of Engine 2 since September 28, 2015 and had been receiving the entire 5% pay increase since November, 2015.

26. Mr. Penn was not immediately told the reason for his transfer, but later officials of the Defendant claimed that he was transferred because he did not possess the required specialty certification to work at Engine Company Two.

27. Engineer Kurt Carter assumed Mr. Penn's place as Acting Captain of Engine Company 2. Upon information and belief, Engineer Carter never requested a transfer to Engine Company 2. Engineer Carter did not possess, nor was he in the process of obtaining, a specialty certification.

28. Mr. Penn was transferred to Station Nine, Engine Company 9 and assigned to a lesser paid position as Engineer. As a result of the transfer to Engine 9, Mr. Penn lost his title of Acting Captain and his pay was reduced by 5%.

29. Engine Company 9 assists with the Fire Department's decontamination unit. Mr. Penn did not possess, nor was he in the process of obtaining, specialty certification related to decontamination.

30. Engine Company 9 is a company known to Fire Department officials for its high volume of "after hour" overnight alarms. Firefighters assigned to Engine Company 9 must respond to

5

approximately twice as many overnight calls as firefighters working at Mr. Penn's previous station, Engine Company 2. As a result of this change, Mr. Penn suffered increased sleep deprivation and stress.

31. On March 2, 2017, Mr. Penn filed a second EEOC charge, Charge No. 435-2017-00340, regarding his concern that officials of Defendant transferred him to a lesser paying, higher stress position in retaliation for filing his first EEOC charge on December 27, 2016.

32. Firefighters have yearly performance evaluations. The evaluations are completed by the firefighter's immediate current supervisor. The performance evaluation provides for three levels of pay increases: Level 1, "Met Expectations," provides for a 1% raise; Level 2, "Exceeded Expectations," provides for a 1.5% raise; Level 3, "Top Performer," provides for a 3% raise.

33. For many years before 2017, Mr. Penn received ratings on his evaluation of Level 2 or Level 3.

34. In 2017, Fire Department supervisors were required to complete their evaluations by May 13, 2017.

35. Mr. Penn's 2016-2017 evaluation was not completed by the end of May. Mr. Penn was concerned, because a delayed evaluation meant his expected yearly pay increase was also delayed. Additionally, he was concerned that officials of Defendant were retaliating against him by delaying the evaluation.

36. In June, Mr. Penn emailed District Chief Brown and Senior Human Resources Analyst Kemberly Ewing inquiring about the status of his evaluation.

37. On June 7, 2017, Mr. Penn filed a grievance with the City regarding his delayed evaluation and concern that officials of Defendant were retaliating against him for the complaints he

6

Case 1:18-cv-00140-CCE-JEP   Document 1   Filed 02/26/18   Page 6 of 13

made against them.

38. On or around June 15, 2017, Mr. Penn asked his current immediate supervisor, Captain Kendal Haley, about the status of his evaluation. Captain Haley told Mr. Penn that he had completed the evaluation, but was told not to move forward until he had heard from Chief Mayo. Captain Haley gave Mr. Penn a copy of the evaluation he had completed.

39. In this first version of the evaluation, Captain Haley rated Mr. Penn as a "Top Performer," with 10/10 and 5/5 in all performance dimension categories. Captain Haley stated about Mr. Penn,

> Engineer Penn worked as an acting Captain at Engine Two before being assigned to Engine Nine Platoon One. He received top performance evaluations due to his leadership, decision making and his can do attitude with his personnel. He did not ask for the [Engine Two] Captain position, it was offered to him because the department knew he could get the job done. ... He has been beneficial to the crew with his many years of knowledge and his ability to be a team player. Engineer Penn communicates very effectively with myself and the rookie firefighter. I can see now and in the future we will continue to be effective during customer service, fire suppression and non-suppression duties with Engineer Penn's willingness to do whatever it takes to get the job done.

40. Captain Haley's evaluation would have ranked Mr. Penn in the highest level of employee performance, Level 3, and would have entitled him to a 3% pay increase had the evaluation been left undisturbed.

41. On June 15, 2017, Mr. Penn filed a third EEOC charge, No. 435-2017-00597, stating that officials of Defendant discriminated against him due to his race and retaliated against him when they delayed completion of his yearly evaluation and the accompanying yearly pay increase.

42. On June 21, 2017, Fire Chief William Mayo ("Fire Chief Mayo") stated in an email to Mr. Penn that his evaluation had not been completed because District Chief Brown was holding

7

it because Mr. Penn had pending grievances. Fire Chief Mayo stated that District Chief Brown would make sure Captain Haley knew he could proceed with his part of the evaluation.

43. On June 26, 2017, at the direction of Fire Chief Mayo, District Chief Brown emailed both Captain Haley and Mr. Penn's former supervisor about whom he had complaint in grievances and EEOC charges, Battalion Chief Needham. District Chief Brown ordered them to meet and "compare notes" so that Captain Haley could write an evaluation for Mr. Penn based on both his own and Chief Needham's views of Mr. Penn's performance.

44. Shortly thereafter, Captain Haley met with Battalion Chief Needham and re-wrote the evaluation he had previously completed for Mr. Penn, incorporating Battalion Chief Needham's comments as he was directed.

45. On or around July 9, 2017, Captain Haley gave Mr. Penn a copy of the written notes Battalion Chief Needham provided to Captain Haley for the evaluation. The notes referenced Mr. Penn's prior complaints about the unequal application of the grooming policy.

46. On or around the last week of July, 2017, Mr. Penn finally received his completed evaluation.

47. In Mr. Penn's final, re-written performance evaluation, his performance rating was a Level 2. As a result, his pay was only increased by 1.5% instead of the 3% increase that would have resulted from Captain Haley's initial evaluation.

48. The reduced 1.5% pay increase to which the re-written evaluation entitled Mr. Penn was not paid retroactive to July 1, 2017, but only became effective July 21, 2017.

49. Upon information and belief, the evaluations for other firefighters who had not filed recent EEOC charges and grievances were conducted during this time period with no irregularities. For example, the evaluations of Acting Captains Leon Witherspoon and Desmond Teal were

conducted by their immediate supervisors with no intervention or re-writing by their past supervisors.

50. On July 27, 2017, Mr. Penn filed a fourth EEOC charge, No. 435-2017-00706, stating that Chief Mayo and District Chief Brown retaliated against him for his filing EEOC charges and grievances when they implemented a special process to incorrectly perform his evaluation, causing him to lose 1.5% of his salary increase. The EEOC has not yet issued a right to sue letter for this charge. Plaintiff intends to amend his Complaint to include this charge once he receives the right to sue letter.

## First Claim

(Race Discrimination and Retaliation under Title VII)

51. Plaintiff re-alleges and incorporates paragraphs #2 through #50.
52. As alleged above, Plaintiff filed EEOC Charges Nos. 435-2017-00196, 435-2017-00340, and 435-2017-00597 alleging racial discrimination and retaliation for his efforts to raise and correct disparate treatment.
53. The EEOC issued right-to-sue letters in each of these charges on or about December 1, 2017.
54. Plaintiff received each of the right-to-sue letters on December 5, 2017.
55. This action is being filed within 90 days of Plaintiff's receipt of the right-to-sue letters.
56. The actions of officials of Defendant as set forth herein constitute discrimination on the basis of race and retaliation against Plaintiff for his reports of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e, *et seq*.
57. Officials of Defendant discriminated against Plaintiff based on his race, African-American,

9

when they unequally applied the facial hair grooming policy to African-American firefighters.

58. As a result of Plaintiff filing grievances and EEOC charges regarding racial discrimination within the Fire Department, officials of Defendant developed animosity towards Plaintiff.

59. As a result of this animosity, officials of Defendant retaliated against Plaintiff by transferring him from his position as Acting Captain at Station Two to a lesser-paying, higher stress position at Station Nine in February 2017.

60. Officials of Defendant retaliated against Plaintiff by delaying the completion of his performance evaluation and by giving him an unjustified negative performance evaluation which resulted in a lesser salary increase.

61. The actions of Defendant's officials constitute discrimination on the basis of race and retaliation against him in violation of Title VII of the Civil Rights Act.

62. As a result of Defendant's discrimination retaliatory employment actions, Plaintiff has suffered substantial damages, including loss of wages and fringe benefits, and is entitled to appropriate relief.

Second Claim

(The Constitution of North Carolina Article I, §19 and 35)

63. Plaintiff re-alleges and incorporates paragraphs #2 through #50.

64. As set forth above, Defendant discriminated against Plaintiff on the basis of his race and denied him the equal protection of the laws in violation of Article I, § 19 and 35 of the Constitution of North Carolina.

65. Officials of Defendant discriminated against Plaintiff based on his race, African-American,

when they unequally applied the facial hair grooming policy to African-American firefighters.

66. As a result of Plaintiff raising issues of illegal racial discrimination within the Fire Department, officials of Defendant developed animosity towards Plaintiff and retaliated against him.

67. The retaliation by Defendant's officials against Plaintiff include transferring him from his position as Acting Captain at Station Two to a lesser-paying, higher stress position at Station Nine in February 2017; delaying the completion of his performance evaluation and unjustifiably lowering his performance evaluation rating which resulted in a reduction of the salary increase that he should have received.

68. Such actions, omissions, and decisions on the part of Defendants were taken in response to, and in retaliation for, Plaintiff's complaints of racial discrimination in the Fire Department. Any grounds and reasons offered by Defendants for the adverse actions, omissions, and decisions taken against Plaintiff are false and pretextual.

69. Defendant's actions violate rights guaranteed by the Declaration of Rights, including Article I, § 19 and 35 of the Constitution of North Carolina.

70. Plaintiff has no other effective remedy under North Carolina law. This is particularly true with respect to the request for declaratory and injunctive relief to prevent future discrimination and retaliation against Plaintiff.

71. As a result of the discrimination and retaliation to which Plaintiff has been subjected, Plaintiff has incurred substantial damages and is entitled to appropriate relief pursuant to Article I, § 19 and 35.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

1) Grant Plaintiff a trial by jury on all issues so triable.

2) Declare that Defendant discriminated against Plaintiff because of his race, African-American, in violation of Title VII of the Civil Rights Act.

3) Declare that Plaintiff was subjected to retaliation in violation of Title VII of the Civil Rights Act, because he asserted his rights to equal employment opportunity.

4) Declare that Defendant discriminated against Plaintiff because of his race in violation of Article I, § 19 and 35 of the Constitution of North Carolina.

5) Declare that Defendant retaliated against Plaintiff in violation of Article I, § 19 and 35 of the Constitution of North Carolina.

6) Award Plaintiff damages for his loss of income resulting from the discrimination and retaliation that he has suffered. This should include not only loss of wages, but loss of fringe benefits. Such damages should be in an amount in excess of $10,000.00.

7) Award Plaintiff compensatory damages for Defendant's discrimination against him for the stress, humiliation, and suffering he has experienced as a result of Defendant's illegal actions.

8) Direct that Defendant reinstate Plaintiff to an Acting Captain position.

9) Grant permanent injunctive relief prohibiting Defendant from engaging in further acts of discrimination and/or retaliation against Plaintiff.

10) Grant Plaintiff pre-judgement and post-judgement interest on all damages to the maximum extent allowed law.

11) Award Plaintiff his costs in bringing and prosecuting this action, including his reasonable attorneys' fees.

12) Grant such other and further relief as to the Court seems just and proper.

This the 26th day of February 2018.

EDELSTEIN & PAYNE
Attorneys for Plaintiffs

/s/ M. Travis Payne
M. Travis Payne
N.C. Bar No 8452
Email: eandp@mindspring.com

/s/ Elizabeth A. Albiston
Elizabeth A. Albiston
N. C. Bar No. 36585
Email: eli@edelsteinpayne.com

P.O. Box 28186
Raleigh, N.C. 27611
(919) 828-1456